FILED
2012 Sep-27  PM 03:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| AMY COCHRAN, | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| v. | } | |
| | } | **CASE NO. 2:10-cv-3522-SLB** |
| FIVE POINTS TEMPORARIES, | } | |
| LLC; DAVID MCNEIL; TRACY | } | |
| MCNEIL; | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

This case is before the court on defendants' Motion to Disqualify Counsel, (doc. 5),[1] and plaintiff's Motion for Sanctions Pursuant to Rule 11, (doc. 13).  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that the Motion to Disqualify Counsel is due to be denied[2] and the Motion for Sanctions Pursuant to Rule 11 is due to be denied.

## I.  BACKGROUND

Plaintiff, Amy Russo Cochran is a former employee of defendant, Five Points, a staffing company owned by defendants Tracy and David McNeil.  (Doc. 5 at 2.)  After working for Five Points from 2002 to 2006, Cochran voluntarily terminated her

---

[1] Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

[2] On September 2, 2011 the court entered an Order denying defendants' Motion to Disqualify counsel.  (Doc. 44.)  This Opinion, although entered afterwards, supports the court's denial of defendants' Motion.

employment in 2006.  (*Id.*)  She then began working for a competitor of Five Points,

Lyons HR.  (*Id.*)  After Cochran was discharged from Lyons HR, Five Points rehired

Cochran in May 2008 as a sales representative.  (*Id.*)

In June 2008, Lyons HR filed a lawsuit against Cochran and Five Points in

Alabama state court for violation of a non-compete and non-solicitation agreement,

alleging that Cochran breached these agreements by "directly soliciting business from

Lyons' customers" and by soliciting Lyons HR employees to become Five Points

employees.  (Doc. 5 at 2-3, 23.)  Tracy and David McNeil agreed to pay for Cochran's

legal expenses in the lawsuit, and the Frederick Firm was hired to represent her.  (*Id.* at 3;

doc. 1 ¶¶ 49-52.)  Tracy and David McNeil signed an engagement letter with the

Frederick Firm.[3]  (Doc. 14-1.)  The McNeils hired the law firm Tanner & Guin, LLC, to

represent Five Points in the Lyons HR lawsuit.  (Doc. 13 ¶ 11.)  The Frederick Firm and

Tanner & Guin entered into a joint defense agreement outlining the joint defense

privilege, or the confidentiality of defense co-counsel communications and sharing of

documents with regard to outside parties.  (Doc. 14-2.)

In October 2008, the Frederick Firm countersued Lyons HR on behalf of Cochran.

(Doc. 5 at 4.)  When David McNeil found out about the countersuit, he felt that Five

Points did not have an obligation to fund it and decided to stop paying the Frederick

Firm's invoices until an estimate was done on future costs of continuing the case.  (*Id.*)

---

[3] Barry Frederick and Brandi Frederick are the only attorneys in the Frederick Firm.
(Doc. 8-1 ¶ 3.)

After receiving the estimate, David McNeil found that continuing to fund Cochran's defense in the Lyons HR suit would be too expensive, and told the Frederick Firm that he would not be responsible for any additional work done on behalf of Cochran.   (*Id.* at 5.) David McNeil continued to receive invoices for the Frederick Firm's work, but stopped paying for their representation of Cochran after he told the firm he would stop funding Cochran's defense.  (*Id.*)

In December 2010, the Frederick Firm filed this lawsuit on behalf of Cochran against Five Points and David and Tracy McNeil, asserting counts of race discrimination, retaliation, intentional interference with business relationship, fraud, and misrepresentation.  (Doc. 1.)  In the Complaint, Cochran asserts that Five Points subjected Cochran (white) to a hostile environment based on race subjected Cochran to adverse treatment on the basis of her race; and adversely changed the terms and conditions of Cochran's employment in retaliation for Cochran's opposition to Five Points's discriminatory employment practices and hostile environment.  (Doc. 1 at 18-20.)

The Complaint also asserts that defendants intentionally interfered with the attorney-client business relationship between Cochran and the Frederick Firm.   (Doc. 1 at 20-21.)  The fraud counts assert that Tracy McNeil misrepresented a fact regarding the validity of Cochran's non-compete agreement with Lyons HR, that Tracy McNeil fraudulently represented to Cochran that defendants would pay her legal fees in connection with the Lyons HR suit, and that defendants "fraudulently suppressed from

3

Plaintiff, and did not speak the whole truth to Plaintiff, all true facts about Defendants'
representation to Plaintiff that Defendants would pay Plaintiff's attorneys' fees and
expenses for Plaintiff's defense" in the Lyons HR suit.  (*Id.* at 21-23.)

Defendants Motion to Disqualify Counsel, (doc. 5), contends that the Frederick
Firm should be disqualified from representing Cochran in the current lawsuit because of
its involvement in the Lyons HR suit.  After this Motion was filed, plaintiff filed her First
Amendment to the Complaint, asserting counts of additional retaliation, additional
unlawful interference with business relations, and breach of contract.  (Doc. 7.)  Plaintiff
also filed a Motion for Sanctions Pursuant to Rule 11, (doc. 13), asserting that
defendants' Motion to Disqualify was a "wholly unfounded attempt to disqualify" the
Frederick Firm for the purpose of harassing plaintiff.  (Doc. 13 at 3.)  Plaintiff also filed a
Motion to Strike the defenses asserted in defendants' Answer.  (Doc. 18.)  As directed in
an Order by the court, (doc. 35), plaintiff filed a new amended complaint, (doc. 36),
consolidating all of her counts into one document, including arguments asserted in the
Motion to Strike, which was denied as moot.  (Doc. 35.)

On May 10, 2011 and October 26, 2011, the court held hearings on plaintiff's
Motion for Sanctions.  The court indicated at the hearings that plaintiff's Motion for
Sanctions was due to be denied, and that plaintiff's counsel was potentially subject to
sanctions for the language in its briefs, to be discussed below.

## II. DISCUSSION

### A.  MOTION TO DISQUALIFY, (Doc. 5)

Defendants contend that the Frederick Firm should be disqualified because of the firm's prior representation of plaintiff in the Lyons HR suit, when she was a codefendant with Five Points.  "Motions to disqualify are governed by two sources of authority." *Herrmann v. Gutterguard, Inc.*, 199 F. App'x 745, 752 (11th Cir. 2006) (per curiam). "First, attorneys are bound by the local rules of the court in which they appear." *Id.*  The Alabama Rules of Professional Conduct and judicial decisions interpreting those rules and standards govern the professional conduct of members appearing before the United States District Court for the Northern District of Alabama.  N.D. Al. LR83.1(f).  Second, "federal common law also governs attorneys' professional conduct because motions to disqualify are substantive motions affecting the rights of the parties." *Herrmann*, 199 F. App'x at 752.

The party bringing the motion to disqualify bears the burden of proving the grounds for disqualification.  *In re Bellsouth Corp.*, 334 F.3d 941, 961 (11th Cir. 2003). "Because a party is presumptively entitled to the counsel of his choice, that right may be overridden only if 'compelling reasons' exist." *Id.* (quoting *Tex. Catastrophe Prop. Ins. Ass'n v. Morales*, 975 F.2d 1178, 1181 (5th Cir. 1992)).  A disqualification order "is a harsh sanction, often working substantial hardship on the client" and therefore "should be resorted to sparingly." *Norton v. Tallahassee Mem'l Hosp.*, 689 F.2d 938, 941 n.4 (11th

Cir. 1982).  An objection based on conflict of interest "should be viewed with caution . . .

for it can be misused as a technique of harassment."  Ala. Rules of Prof'l Conduct R. 1.7,

cmt.  To succeed on a conflict of interest claim, the conflict "must be actual, and not

speculative."  *United States v. Tobon-Hernandez*, 845 F.2d 277, 281 (11th Cir. 1988).

In ruling on a motion to disqualify counsel, the district court "must clearly identify

a specific Rule of Professional Conduct which is applicable to the relevant jurisdiction

and must conclude that the attorney violated that rule."  *Schlumberger Techs., Inc. v.

Wiley*, 113 F.3d 1553, 1561 (11th Cir. 1997).  Defendants contend that the Frederick Firm

has violated Rules 1.7 and 1.9 of the Alabama Rules of Professional Conduct.  (Doc. 5 at

6.)

### 1.    Rule 1.7

Rule 1.7 states in relevant part that "[a] lawyer shall not represent a client if the

representation of that client will be directly adverse to another client, unless: (1) The

lawyer reasonably believes the representation will not adversely affect the relationship

with the other client; and (2) Each client consents after consultation."  Ala. Rules of

Prof'l Conduct R. 1.7.

> "Rule 1.7 governs a lawyer's responsibility with regard to
> *concurrent clients* . . . At a minimum, a party seeking
> disqualification for the conflict addressed in Rule 1.7 must
> demonstrate (1) that it is a current *client* of the lawyer whose
> representation is challenged, and (2) that the party's interests
> 'conflict' with the interests of the other client, or with the
> interests of the lawyer."

*Ex parte Tiffin*, 879 So. 2d 1160, 1164-65 (Ala. 2003).  (Emphasis in original).

Defendants do not allege that they are "current clients" of the Frederick Firm, but instead

describe the relationship with the Frederick Fir

m in the past tense, stating, "An attorney-client relationship *existed* between Five Points,

the McNeils and The Frederick Firm."  (Doc. 14 at 4) (emphasis added).  Accordingly,

there is no basis for disqualification under Rule 1.7.

       2.      **Rule 1.9**

      Alabama Rule of Professional Conduct 1.9 states that "[a] lawyer who has

formerly represented a client in a matter shall not thereafter:

> (a) Represent another person in the same or a substantially
> related matter in which that person's interests are materially
> adverse to the interests of the former client, unless the former
> client consents after consultation; or

> (b) Use information relating to the representation to the
> disadvantage of the former client except as Rule 1.6 or Rule 3.3
> would permit or require with respect to a client or when the
> information has become generally known."

Accordingly, "[a] former client seeking disqualification for the conflict addressed in Rule

1.9 must demonstrate (1) that it 'had an attorney-client relationship with the attorney the

former client seeks to disqualify and [[2]] that the attorney represented the former client

in a [[3]] substantially related matter.'" *Ex parte Tiffin*, 879 So. 2d at 1165 (alteration in

original) (quoting *Ex parte Intergraph Corp.*, 670 So. 2d 858, 860 (Ala. 1995)).

**a. "Former client"**

The first issue to be decided is whether Five Points is a former client of the Frederick Firm, and, specifically, whether Five Points was a client of the Frederick Firm during the Lyons HR suit.  The court concludes that Five Points is not a former client of the Frederick Firm, but that the Frederick Firm may still owe Five Points a duty of confidentiality due to the joint defense agreement in place during the Lyons HR lawsuit.

"The mere existence of an express contract of employment, or the payment of legal fees, or the length of the consultation is not determinative" of the establishment of a lawyer-client relationship.  *Green v. Montgomery Cnty., Ala.*, 784 F. Supp. 841, 845 (M.D. Ala. 1992) (citations omitted).  "Rather, the test for determining the existence of this fiduciary relationship [between lawyer and client] is a subjective one and 'hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention is to seek professional legal advice.'" *Id.* at 845-46 (quoting *Westinghouse Electric Corp.*, 580 F.2d 1311, 1319 (7th Cir. 1978)).  "This subjective belief must, however, be a reasonable one."  *Id.* at 846.

1. Engagement Letter

In the Lyons HR suit against Cochran and Five Points, Five Points signed an engagement letter with the Frederick Firm, (doc. 14-1), and paid for Cochran's legal expenses until Cochran filed a counterclaim in the suit.  The engagement letter is four pages and details the Frederick Firm's billing practices.  (Doc. 14-1.)  Defendants argue

that the engagement letter is evidence of an attorney client relationship between Five Points and the Frederick Firm, and that it is more than simply an acknowledgment or agreement to pay Cochran's legal fees.  (Doc. 14 at 5-6.)  Defendants state that in the letter, the Frederick Firm gives advice about the outcome of the case as whole, "not simply the claims made against Amy Cochran."  (*Id.* at 5.)  Defendants contend that "[t]he Frederick Firm did not limit their engagement letter to the claims made against Amy Cochran and thus Five Points reasonably believed The Frederick Firm was representing its interests."  (*Id.* at 6.)  Defendants also argue that David McNeil's attempts to cut off the Frederick Firm's representation of Cochran and his instructions to Brandi Frederick that she was not authorized to continue working on the case show that the McNeils believed they had an attorney-client relationship with the Frederick Firm.  (*Id.*)  In response, the Frederick Firm argues that any belief on the part of Five Points that Five Points was the Frederick Firm's client in the Lyons HR suit was "naive," (doc. 8 at 8), as the engagement letter did not create a lawyer-client relationship between the Frederick Firm and Five Points, and the defendants' own Motion to Disqualify acknowledges that the Frederick Firm was retained to defend Amy Cochran, (*id.* at 5, 8).

The court agrees with the Frederick Firm that the engagement letter is not evidence of an attorney-client relationship between Five Points and the Frederick Firm. Defendants argue that the Frederick Firm's discussion in the engagement letter of the merits of the Lyons HR lawsuit, which stated that the Frederick Firm did not believe the

suit would likely proceed past a motion to dismiss, caused Five Points to believe the

Frederick Firm was "representing its interests." (Doc. 14 at 6.) Any such belief on the

part of Five Points was unreasonable. The first paragraph of the letter clearly states that

the Frederick Firm "has been retained by Amy Russo [Cochran] to defend her" in the

Lyons HR lawsuit, that Five Points has agreed to be responsible for "our legal fees and

expenses associated with our representation of Ms. Russo in this lawsuit." (Doc. 14-1 at

2.) The letter continues, stating, "This engagement letter is intended to apprise you of our

billing practices and policies and to provide you with an explanation of how our legal fees

and expenses associated with our representation of Ms. Russo will be billed." (*Id.*) The

first two pages lay out the firm's billing rates and expenses for which it charges. The

third page, the last substantive page of the letter, discusses the firm's billing procedures

and the requirement of a retainer. In the context of discussing the retainer amount, the

letter states:

> We will accept a smaller retainer . . . in this case until after the
> September 3 hearing on the Motion to Dismiss Five Points already filed, which
> Amy Russo will join. The Court should grant that motion and dismiss the case,
> as it is settled law under applicable Georgia law that a non-compete without
> a geographic restriction is unenforceable. If the Judge does not dismiss the
> case after the hearing on the motion to dismiss, we will then require the larger
> $5,000.00 replenishing retainer throughout our representation. We expect the
> case will end and be over after the hearing on the motion to dismiss.

(*Id.* at 4.) The letter concludes by asking for acceptance of responsibility for payment of

legal fees associated with the firm's representation of Cochran according to the described

terms. (*Id.*)

Defendants' claim that the Frederick Firm's discussion of the expected outcome of the case led defendants to believe that the Frederick Firm was representing its interests is unreasonable.  The letter only mentions the motion to dismiss in explaining that the firm's retainer will increase if the motion is denied and the case is consequently prolonged.  The letter does not contain legal advice, and the only reference to the law is one sentence about the validity of non-compete agreements under Georgia law as an explanation for the firm's view of a likely dismissal of the case.  Moreover, the letter indicates that Five Points had already filed a Motion to Dismiss before the engagement letter with the Frederick Firm was signed, as it mentions "the Motion to Dismiss Five Points already filed, which Amy Russo will join."  (*Id.* at 4.)  Presumably, then, Five Points had already retained Tanner & Guin by this point, and should have received independent legal advice about the case from Tanner & Guin.  Finally, the engagement letter clearly states that the Frederick Firm represents Cochran, and, therefore, contrary to the defendants' argument, there is no ambiguity with regards to whether the Frederick Firm is being hired to also represent Five Points.  The engagement letter does not provide a basis to conclude that the McNeils could have reasonably believed that they were clients of the Frederick Firm.

The court also notes that the arrangement for Five Points's payment of Cochran's legal fees outlined in the engagement letter is not by itself impermissible, as "payment of legal fees by a third party does not automatically rise to the level of a conflict of interest." *Tobon-Hernandez*, 845 F.2d at 281; *see also Caderno v. United States*, 256 F.3d 1213,

11

1219 (11th Cir. 2001) (per curiam) ("courts generally presume that counsel will

subordinate his or her pecuniary interests and honor his or her professional responsibility

to a client"(internal quotation marks and citations omitted)); *United States v. Corona*, 108

F.3d 565, 575 (5th Cir. 1997) (holding that defendant's counsel's receipt of payment from

co-defendant did not establish a conflict of interest, as "[t]he fact that Corona paid

McDonald's counsel does not mean that [McDonald's counsel] represented Corona").

2. Joint Defense Agreement

Defendants further argue that the joint defense agreement entered into by their

counsel, Tanner & Guin, and the Frederick Firm is evidence of a lawyer-client

relationship between Five Points and the Frederick Firm and that, because of the

agreement, the Frederick Firm owes Five Points a duty of confidentiality.  (Doc. 14 at 11-

14.)  The Frederick Firm argues that, despite the joint defense agreement, there was no

lawyer-client relationship between the Frederick Firm and Five Points because each party

maintained separate counsel.  (Doc. 8 at 6.)  The joint defense agreement presents a close

question with regard to the existence of an alleged conflict.

Defendants maintain that counsel for Five Points and Cochran entered into a joint

defense agreement as they shared a "common purpose - defending against the non-

compete agreement and retention of Amy Cochran as an employee."  (Doc. 5 ¶ 12.)  The

joint defense agreement states in part:

> We have collectively concluded that our representative
> clients have many interests in common and can be expected to

assert many common claims and defenses in these proceedings. We have also concluded that, from time to time, the collective interests of our respective clients will be most effectively and efficiently served by sharing documents, factual materials, mental impressions, memoranda, interview reports and other information, including the confidences of our clients (hereinafter referred to as "defense materials"). Some or all of these defense materials may be privileged from disclosure to adverse or other parties as a result of the attorney-client privilege, the work product doctrine, or other applicable privilege(s).

Under the circumstances of these proceedings, we have agreed to exchange defense materials among ourselves in order to further our clients' common interests. It is our collective understanding that such exchanges or disclosures are not intended to diminish in any way the confidentiality of such materials. It is our further understanding that any exchange of defense materials will not constitute a waiver of any otherwise available privilege.

(Doc. 14-2 at 2.) The agreement further states, "Defense materials that are shared, and the information contained therein, are to be used solely by counsel in the preparation of the defenses to this proceeding and for no other purpose." (*Id.*)

Where a party shows that he had an attorney-client relationship with the opposing party's attorney in a prior substantially related matter, "he will be entitled to an irrebuttable presumption that 'during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation.'" *Green*, 784 F. Supp. at 844 (quoting *T.C. Theatre Corp. v. Warner Bros. Pictures*, 113 F. Supp. 265, 269 (S.D.N.Y. 1953)); *see also In re Yarn Processing Patent Validity Litig.*, 530 F.2d 83, 89 (5th Cir. 1976). However, there is no irrebuttable presumption of shared

confidences between a co-defendant and counsel for another defendant.  *See Wilson P. Abraham Constr. Corp. v. Armco Steel Corp.*, 559 F.2d 250, 253 (5th Cir. 1977).

"Courts have consistently viewed the obligations created by joint defense agreements as distinct from those created by actual attorney-client relationships." *United States v. Stepney*, 246 F. Supp. 2d 1069, 1080 (N.D. Cal. 2003) (holding that, where each defendant has retained his own counsel under a joint defense agreement in a criminal case, there is no duty of loyalty or attorney-client relationship between each counsel and each co-defendant).  Therefore, in evaluating whether it amounts to a conflict of interest for an attorney to subsequently represent, in a separate action, a party suing (or being sued by) his client's former co-defendant under the joint defense agreement, some courts have held that the rules of professional conduct governing conflicts with former clients do not apply because the former co-defendant was never a client of that attorney.  *See Fred Weber, Inc. v. Shell Oil Co.*, 566 F.2d 602, 609-10 (8th Cir. 1977) (Canon 4 of ABA Code of Professional Responsibility, addressing lawyer-client confidentiality, held inapplicable to case where plaintiff's counsel had been counsel to co-defendants of current defendants in prior criminal case and where there was no indication that conflicting interests existed or that information had been supplied to plaintiff by current defendants "in confidential reliance on [counsel] or otherwise"), *overruled on other grounds*, *In re Multi-Piece Rim Prods. Liab. Litig.*, 612 F.2d 377 (8th Cir. 1980).

14

Plaintiff cites *United States v. Almeida*, 341 F.3d 1318 (11th Cir. 2003), as support for the argument that when parties to a joint defense agreement are represented by separate counsel, no attorney-client relationship exists between one defendant's attorney and a co-defendant.  (Doc. 8 ¶ 14.)  In *Almeida*, the Eleventh Circuit held that no duty of loyalty exists between counsel for one member of a joint defense agreement and a co-defendant of the counsel's client, but that communications made during the joint defense are privileged.  341 F.3d at 1323.  *Almeida* was a criminal case, and the co-defendants hired their own defense attorneys but entered into a joint oral defense agreement pursuant to which the parties exchanged information regarding their respective defenses.  *Id.* at 1320.  A month before trial, one of the defendants, Fainberg, decided to testify on behalf of the government in exchange for a plea agreement.  *Id.*  The government advised the court that it expected Fainberg, when asked to testify, to claim an attorney-client privilege pursuant to the joint defense agreement with the remaining defendant, Almeida.  *Id.*  The government argued that Almeida's attorney was impaired by a conflict of interest due to the joint defense arrangement and should be prohibited from using any confidential information the attorney had obtained from Fainberg through the course of the joint defense when cross-examining Fainberg.  *Id.*  The district court concluded that the joint defense agreement precluded Almeida's counsel from using any information obtained from Fainberg during the joint defense, and barred counsel's use of Fainberg's

15

communications during cross-examination as well as any derivative use of the communications.  *Id.* at 1321.

On appeal, the Eleventh Circuit held that the district court abused its discretion when it precluded Almeida from using communications that Fainberg made to Almeida's attorney during the course of the joint defense agreement.  *Id.* at 1323.  The court held that Fainberg waived the privilege when he agreed to plead guilty and testify against Almeida in exchange for a partial dismissal of the indictment.  *Id.*  In so holding, the court relied on the "ancient rule" that "where an accomplice turns state's evidence and attempts to convict others by testimony which also convicts himself, he thereby waives the privilege against disclosing communications between himself and counsel."  *Id.* at 1325 (citations omitted).  The court explained:

> When co-defendants enter into a joint defense agreement, by contrast [to a situation where one attorney represents several defendants], each defendant retains his own attorney. . . . . [C]onfidential communications made during joint defense strategy sessions are privileged. . . . . A duty of loyalty, however, does not exist in this situation and it is therefore improper to conclude that all of the attorneys in the joint defense strategy session represent all of the participating defendants. Any potential conflict of interests arises solely from the fact that when defendant *B* becomes a witness for the state, the attorney for defendant *A* must make sure that the attorney-client privilege is respected and that confidential communications are not revealed. The mere inability to utilize the privileged communications is not itself a manifestation of a conflict of interest, because no lawyer in the world could utilize those communications.

*Id.* at 1323 (citations omitted).  The court found that the district court's erroneous evidentiary rulings were not harmless and vacated Almeida's conviction.  *Id.* at 1326.

16

Plaintiff argues that, under *Almeida*, "Defendants' reliance on the joint defense agreement is, per the Eleventh Circuit, improper."  (Doc. 8 at 7.)  However, *Almeida* is not directly on point.  While *Almeida* did hold that no duty of loyalty exists between one defendant and the lawyer of his co-defendant under a joint defense agreement, and stated in dicta that "little can be gained by extending the privilege to those communications made to attorneys that do not represent the defendant," *Almeida* does not address the same question that is presented by this case.  341 F.3d at 1324.  *Almeida* addressed the effect of a co-defendant's decision to defect from the joint defense agreement on the status of the joint defense privilege, holding that the defendant's decision to defect renders that defendant's communications to the co-defendant's attorney no longer privileged.  The case did not address the situation presented here, where a party to a joint defense agreement later sues his former co-defendant with the same counsel representing him in both cases.

Contrary to plaintiff's assertion that "the case law absolutely rejects Defendants' positions," (doc. 8 at 6), some courts have held that disqualification may be warranted even where no direct attorney-client relationship exists between the party seeking the disqualification and the attorney whose disqualification is sought.  These courts have held that, in a situation involving a joint defense agreement, a former co-defendant of an attorney's client may seek disqualification of that attorney in a subsequent suit where the attorney is now representing an adversary of the former co-defendant if the matters are

substantially related and if confidential information was exchanged during the prior action. *See Armco Steel Corp.*, 559 F.2d at 253; *All Am. Semiconductor, Inc. v. Hynix Semiconductor, Inc.*, No. C 07-1200, 2008 WL 5484552, at *4-5 (N.D. Cal. Dec. 18, 2008). In *Armco Steel Corporation*, the court held that when information is exchanged between co-defendants and their attorneys, an attorney who has received such information owes a fiduciary duty to non-client co-defendants not to use the information in a later representation of another client to the detriment of the co-defendants from the previous suit.  559 F.2d at 253.  The court held that there is no presumption that confidential information was exchanged when each party is represented by their own counsel, and held that the burden is on the party moving to disqualify to show that confidential information had been disclosed to the attorney during the earlier cooperative defense and that the matters were substantially related.  *Id.*  The court stated:

> Just as an attorney would not be allowed to proceed against his former client in a cause of action substantially related to the matters in which he previously represented that client, an attorney should also not be allowed to proceed against a co-defendant of a former client wherein the subject matter of the present controversy is substantially related to the matters in which the attorney was previously involved, and wherein confidential exchanges of information took place between the various co-defendants in preparation of a joint defense.

*Id.* The Fifth Circuit remanded the case to the district court for factual findings regarding whether the two matters were substantially related and whether confidential information was exchanged during the previous joint defense.  *Id.*

18

Similarly, in *All American Semiconductor*, the court disqualified a plaintiff's

attorney due to a conflict of interest where the attorney had received confidential

information about the defendant in the current suit in the course of representing the

plaintiff in a prior joint defense agreement.  2008 WL 5484552, at *7 (N.D. Cal. Dec. 18,

2008).  The court stated:

> [A] conflict of interest may be created when, as here, an attorney
> (Vandevelde [current plaintiff's attorney]) has acquired
> confidential information about a non-client (Infineon [the
> current defendant]) in connection with his representation of a
> client (Hefner), such as when an attorney obtains confidential
> information about a co-defendant of a client during a joint
> defense of an action.  Indeed, contrary to plaintiffs' contention,
> the fact that Vandevelde and Infineon never had an attorney-
> client relationship is not determinative of whether
> disqualification of [plaintiffs' law firm] is appropriate because
> an attorney's receipt of confidential information from a non-
> client may lead to the attorney's disqualification.

2008 WL 5484552 at *6 (internal quotation marks and citations omitted).  Relying on

*Armco Steel Corp.*, the court found that "Vandevelde's participation in the JDA [joint

defense agreement] and receipt of confidential information from Infineon during the joint

defense created an expectation on the part of Infineon that this information would be kept

confidential.  This was a reasonable expectation, particularly given that the JDA

contained a confidentiality provision."  *Id.* at *7.  Accordingly, the court held that

Vandevelde was disqualified from representing the plaintiffs against Infineon, a co-

defendant under the joint defense agreement in a prior case.  *Id.*

A 1995 formal ethics opinion from the American Bar Association provides support for the view that an attorney owes a fiduciary duty not to betray the confidences of the former co-defendant of his client.   The ethics opinion addresses the situation of a lawyer who had represented one member of a joint defense group and then, after changing law firms, was asked to represent a new client against a different member of the original joint defense group.  The ABA stated the following:

> [T]o the extent that Lawyer had acquired in the course of the prior representation information confidential to other members of the consortium, he might owe an obligation to his former client not to disclose the information by reason of the former client's obligation to the other members.  However, . . . if [the former client] did give consent [to the representation], there would be presented the question whether Lawyer had any obligation directly to other members of the consortium, who were not his clients but from whom he received information pursuant to an undertaking of confidence.   In those circumstances, Lawyer would almost surely have a *fiduciary* obligation to the other members of the consortium, which might well lead to his disqualification.  *See Wilson P. Abraham Construction Corp. v. Armco Steel Corp.*, 559 F.2d 250, 253 (5th Cir. 1977). [FN3]
>
>> [FN3 This fiduciary obligation is said to arise from the law of agency (the lawyer having been a sub-agent of the client who in turn was the agent of the co-defendant with whom the confidential information is shared), rather than from the law governing lawyers. . . .]
>
> [The lawyer] would not, however, owe an *ethical* obligation to them, for there simply is no provision of the Model Rules imposing such an obligation.

ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 95-395 (1995) (emphasis added).  Under the logic of the ABA opinion, the Frederick Firm does not owe an ethical obligation to Five Points because it never represented Five Points; however, the Frederick Firm would owe a fiduciary duty to Five Points if confidential information was shared under the joint defense agreement.

Some courts distinguish the situation described in the ABA opinion – where the former co-defense counsel represents a *new* client against a former co-defendant – from the situation of a subsequent lawsuit where the attorney represents the same client he represented in the former lawsuit who is now suing a former co-defendant (that is, original members of the joint defense team suing each other).   In such a situation, at least one court has held that a prior attorney-client relationship between the parties did not exist and that disqualification was not warranted because confidential information was not being shared with third parties.  *See Ageloff v. Noranda*, 936 F. Supp. 72, 76 (D.R.I. 1996) ("The law is well-settled that a joint defense privilege is waived in a subsequent controversy between the joint defendants.").  The *Ageloff* court distinguished the rule of *Armco Steel Corp.*, which found a fiduciary duty to the former co-defendant as inapplicable.  *See id.*

Because there was no direct attorney-client relationship between Five Points and the Frederick Firm, the normal presumption that confidential information was shared does not exist.  *See Armco Steel Corp.*, 559 F.2d at 253.  However, there was an expectation of

21

confidentiality among the parties, as shown by the joint defense agreement.  (*See* doc. 14-2 at 2); *All Am. Semiconductor, Inc.*, 2008 WL 5484552, at *7.  Defendants, as the party moving to disqualify the lawyer of a co-defendant under a joint defense agreement, bear the burden to show that **(a)** confidential information was shared in the prior lawsuit and **(b)** the previous matter was substantially related to the current matter.  *See Armco Steel Corp.*, 559 F.2d at 253.

Defendants allege that "[t]he Frederick Firm would have learned confidential information during their representation of Ms. Cochran in the Lyons HR lawsuit."  (Doc. 5 at 11-12.)  They claim:

> As the Lyons HR Complaint included allegations about solicitation of clients - customer information would have been an issue.  To prove damages, Lyons HR would have had to demonstrate Ms. Cochran's sales to its former customers benefited Five Points.  Thus, sales information and Five Points' processes would have been disclosed to The Frederick Firm.  In this case, Ms. Cochran was terminated for fraudulently reporting sales.  The Frederick Firm could use information they learned while working on the Lyons HR lawsuit to its benefit in this case.  This is a clear case of an appearance of *changing sides* - the McNeils and Five Points hired The Frederick Firm to defend their interests and the interests of their employee and now The Frederick Firm has filed suit against the McNeils and Five Points arising out of the employment of that same employee.

(Doc. 5 at 12.)  In response, plaintiff challenges defendants' allegations that sales information "would have been disclosed" to the Frederick Firm in the prior lawsuit, arguing that defendants have presented no evidence in support of that claim.  (Doc. 8 at 14-15.)

22

In opposition to the Motion to Disqualify, both Barry and Brandi Frederick filed Declarations stating that they did not acquire confidential information about Five Points during the Lyons HR lawsuit.  (Docs. 8-1 & 8-2.)  Specifically, the Declarations state in pertinent part:

> I and The Frederick Firm did not obtain confidential information about any racist or retaliatory employment practices on the part of Five Points from the owner(s) or the management of Five Points (or Five Points' attorneys) in, or in connection with, the Lyons lawsuit.  Nor did we learn from them any confidential information about what Five Points' attorneys had advised Five Points about whether Amy Cochran's agreement with Lyons HR was enforceable . . . .  We also did not learn from them any confidential information about Five Points' customers or sales.

(Doc. 8-1 ¶ 6; doc. 8-2 ¶ 6.)  The Declarations go on to state:

> To the extent there were discussions between me and the attorneys with Tanner & Guin, the law firm that represented Five Points in the Lyons lawsuit, pursuant to a joint defense agreement regarding the Lyons lawsuit, we, on behalf of our respective and different  defendants/clients, discussed tactics and strategies for defending that case. Five Points' owner(s) and management were not present and did not participate in my face-to-face discussions of tactics and strategies, with the attorneys who represented Five Points, and to  my knowledge, they were not present for, and did not participate in, my telephone discussions with Five Points' attorneys about tactics and strategies.

(Doc. 8-1 ¶ 6; doc. 8-2 ¶ 6.)

The court finds that, in light of the declarations filed by the Fredericks, defendants have not met their burden of providing evidence to show that confidential information was exchanged during the course of the joint defense agreement.

### b. Substantially related matter

Even assuming that confidential information was exchanged between Five Points and the Frederick Firm during the Lyons HR lawsuit, the court must next determine whether the Lyons HR case is a substantially related matter to the current case.  "'The substantial relationship test is the keystone of the law on conflicts of interests involving former clients.'" *Ex parte Regions Bank*, 914 So. 2d 843, 848 (Ala. 2005) (quoting 1 Lawyers' Manual on Professional Conduct (ABA/BNA) 51:221 (2004)).  "'[T]he test entails inquiry into the similarity between the factual situations, the legal issues posed, and the nature and extent of the attorney's involvement to see if information from the prior representation is material to the new representation.'" *Id.* (alteration in original) (quoting Lawyer's Manual 51: 225).

"Mere blanket statements will not suffice to satisfy the former client's burden." *Id.* at 849 (internal quotation marks and citations omitted).  "The court can only determine if the substantial relationship test has been met 'when the moving party delineates with specificity the subject matters, issues, and causes of action presented in former representation.'" *Herrmann*, 199 F. App'x at 753 (quoting *Cox v. Am. Cast Iron Pipe Co.*, 847 F.2d 725, 730 (11th Cir. 1988)).  "The moving party has to show more than the mere

24

fact that as a result of a former representation, the attorney has knowledge of the moving party's practices and procedures." *Id.* (citing *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 646 F.2d 1020, 1029 (5th Cir. Unit B 1981)). "The moving party must demonstrate that the attorney 'has knowledge of the particular practices and procedures which are the subject matter of [the] suit.'" *Id.* (quoting *Duncan*, 646 F.2d at 1032).

As stated in the comments to Rule 1.9 of the Alabama Rules of Professional Conduct:

> "The scope of a 'matter' . . . may depend on the facts of a particular situation or transaction. The lawyer's involvement in a matter can also be a question of degree. When a lawyer has been directly involved in a specific transaction, subsequent representation of other clients with materially adverse interests clearly is prohibited. On the other hand, a lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a wholly distinct problem of that type even though the subsequent representation involves a position adverse to the prior client .... The underlying question is ***whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question***."

(emphasis added).

The prior lawsuit involved Cochran's alleged breach of a Non-Disclosure and Non-Solicitation Agreement, and Five Points's alleged interference with Cochran's performance of the Agreement.  (Doc. 5 at 22-27.)  Lyons HR claimed that Cochran breached the Agreement by seeking employment with its competitor, Five Points by directly soliciting business from Lyons's customers, by disclosing confidential information to Five Points, and by soliciting employees of Lyons to become employees of

Five Points.  (*Id.* at 23.)  The present lawsuit involves claims of race discrimination and retaliation arising out of plaintiff's employment with Five Points.  The case also contains claims arising out of defendants' decision to discontinue funding Cochran's counterclaim against Lyons HR during the Lyons HR litigation, including claims that defendants interfered with the business relationship between Cochran and the Frederick Firm, fraudulently misrepresented the enforceability of Cochran's non-compete agreement, fraudulently misrepresented and suppressed the truth regarding defendants' promise to pay plaintiff's attorneys' fees and expenses in connection with the Lyons HR suit, and breached its contract to pay the Frederick Firm's expenses during the Lyons HR suit. (*See* docs. 1, 7, 36.)

In cases where courts have found that a prior matter is substantially related to the current matter, the causes of action in both lawsuits are usually the same.  *Compare Herrmann*, 199 F. App'x at 756 (holding that prior and current lawsuit were substantially related where plaintiff's counsel in current suit investigated defendant's compliance with FLSA overtime  requirements in prior suit, and current suit involved failure to pay employees for overtime worked) *with Ex parte Regions Bank*, 914 So. 2d at 850 (holding that prior and  current lawsuit were not substantially related where both lawsuits involved bond issues involving defendant's companies but current lawsuit involved bond issue that was "entirely separate and distinct from *all* of the bond issues" that member of plaintiff's firm previously handled for one of defendant's companies).   To be substantially related

26

to the claims at issue in the Lyons HR lawsuit, therefore, the claims must, at a minimum, relate to non-compete and non-disclosure issues.  The present lawsuit involves claims of race discrimination and a dispute surrounding the payment of Cochran's legal fees in the Lyons HR lawsuit; this lawsuit does not involve non-compete or non-disclosure promises or practices.  Although both the Lyons HR lawsuit and the current lawsuit contained claims of intentional interference with a business relationship, the business relationship and the type of alleged interference in each case are different.  The prior lawsuit involved interference with a non-compete, while this lawsuit involves interference with Cochran's legal representation and payment of legal fees.

Defendants claim that the current matter is substantially related to the Lyons HR lawsuit because plaintiff held the same position at both Lyons HR and at Five Points, she was responsible for calling on clients and making cold calls during both jobs, and she was fired by Five Points for falsifying sales calls and records.  (Doc. 14 at 7-8.)  Defendants argue:

> It defies belief that customer information and processes would not have been revealed to The Frederick Firm during their engagement. In the Lyons HR suit, the Fredericks would have learned which clients were Lyons HR's and which were Five Points'. The Frederick Firm would have learned about the company's processes (including sales), the company's structure, the company's financial resources, the various employees' functions and duties. . . . . [I]n this discrimination lawsuit, one of the crucial [issues] will be whether Amy Cochran falsified sales records.  Specifically, Amy Cochran was terminated after she claimed she made sales calls to clients but in fact did not.

(*Id.* at 9-10.)  The court disagrees.  The weak connection between the reasons for plaintiff's termination from Five Points and plaintiff's counsel's purported knowledge of Five Points's employee company structure, employees' duties, or sales processes does not amount to a substantial relationship between the two cases.  The court finds that the Lyons HR suit and the race discrimination and retaliation claims in the present lawsuit do not involve matters that are substantially related.

The claims in this lawsuit arising from the dispute regarding the payment of plaintiff's legal fees in the Lyons HR suit are also not substantially related to the claims involved in the prior lawsuit.  As plaintiff notes, "That the fraud claims in the Original Complaint arise out of Tracy McNeil's fraudulent representation to Plaintiff and about Plaintiff's no-disclosure and no-solicitation contract with Lyons HR does not logically make [the] Lyons HR lawsuit for an alleged breach of that agreement **substantially** related to the fraud claims here."  (Doc. 8 at 16-17.)  The court agrees.  Plaintiff further notes that "there are other mechanisms that avoid the substantial hardship of disqualification as to this entire action," such as severing fraud claims from the other claims or permitting plaintiff to obtain separate counsel for the fraud claims.  (*Id.* at 17 n.2.)  Plaintiff further argues that Ala. Rule of Prof'l Conduct 3.7, which prohibits a lawyer from acting as an advocate "at a trial in which the lawyer is likely to be a necessary witness," is "grossly premature."  (*Id.* at 18.)  Plaintiff argues that Rule 3.7 does not prohibit a lawyer from serving as counsel in pretrial proceedings, even if that

attorney would not be able to serve as counsel at trial.  Plaintiff further notes that it intends to prove all of plaintiff's claims through other witnesses.  (*Id.* at 19.)  Alabama Bar Ethics Opinion 1991-19 supports plaintiff's arguments. The Opinion states that Rule 3.7 is not applicable to the pretrial phase of litigation and that "the decision to withdraw can, in good faith, be delayed to a time closer to the date of the trial," when it can more easily be determined whether the lawyer will be a necessary witness at trial or whether one of the exceptions under the Rule applies.  Ala. Bar Ethics Op. 1991-19 (1991).

The defendants have not shown that the present and former lawsuit involve matters that are substantially related.  Accordingly, the Frederick Firm's representation of Cochran in this lawsuit does not present a conflict of interest and the Motion to Disqualify is due to be denied.

## B.  MOTION FOR SANCTIONS, (Doc. 13)

In response to defendants' Motion to Disqualify Counsel, plaintiff filed a Motion for Sanctions Pursuant to Rule 11, (doc. 13).  Plaintiff claims that defendants' "unfounded" Motion to Disqualify Counsel violated subsections 1 through 3 of Rule 11(b) of the Federal Rules of Civil Procedure.  (*Id.* at 1-2.)  Rule 11(b) states:

> By presenting to the court a pleading, written motion, or other paper--whether by signing, filing, submitting, or later advocating it--an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Rule 11 further provides that "[i]f . . . the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." FED. R. CIV. P. 11(c)(1).  Rule 11 motions should not be filed "to exact an unjust settlement, to intimidate an adversary into withdrawing contentions that are fairly debatable, [or] . . . to increase the costs of litigation." FED. R. CIV. P. 11 advisory committee's note.

The court finds that defendants' Motion to Disqualify Counsel was not frivolous. Because there is no directly applicable binding authority on point, the issue of whether the Frederick Firm should be disqualified is "fairly debatable."  Defendants' filing of the Motion to Disqualify Counsel did not violate Rule 11(b), and, therefore, sanctions are

unwarranted.  Accordingly, Plaintiff's Motion for Sanctions Pursuant to Rule 11, (doc. 13), will be denied.

"[T]he filing of a motion for sanctions is itself subject to the requirements of the rule and can lead to sanctions."  FED. R. CIV. P. 11 advisory committee's note. Defendants have submitted e-mails between the Frederick Firm and counsel for the defense sent before plaintiff's Motion for Sanctions was filed in which Barry Frederick offers "to settle our to-be-filed motions for sanctions against you and your clients for the payment of $10,000" to the Frederick Firm.  (Doc. 14-4 at 2.)  After filing its Motion for Sanctions, plaintiff also filed a Sur-Reply to Defendants' Motion to Disqualify, in which plaintiff's counsel used inflammatory language with reference to defense counsel.  (Doc. 24.)  In the Sur-Reply, plaintiff's counsel implicitly calls defense counsel "an unreasonably ignorant person unable to read or understand the English language,"(*id.* at 3), refers to the "dishonesty" of defendants and their counsel, (*id.* at 9), and describes defendants' arguments in their Motion to Disqualify as "a cheap sleight of hand trick of a sidewalk con artist," (*id.* at 9).  At the first hearing held in this case on May 10, 2011, the court considered whether the use of such language was itself sanctionable.[4]

After the hearing on May 10, 2011, plaintiff filed a Motion to Withdraw Plaintiff's Original Sur-Reply to Defendants' Motion to Disqualify and File Substituted Sur-Reply to Defendants' Motion to Disqualify.  (Doc. 25-1.)  Attached to that Motion is Plaintiff's

---

[4]It is not the filing of the Motion for Sanctions itself that the court found potentially sanctionable, but some of the language used by plaintiffs in briefing the motion.

Substituted Sur-Reply to Defendants' Motion to Disqualify.  (Doc. 25-1.)  The

Substituted Sur-Reply omits the previously quoted language, which the court recited at

the hearing as potentially worthy of sanctions.  The Motion to Withdraw Plaintiff's

Original Sur-Reply to Defendants' Motion to Disqualify and File Substituted Sur-Reply

to Defendants' Motion to Disqualify is due to be granted.  In light of plaintiff's

withdrawal of its original Sur-Reply,  the court will not impose sanctions on plaintiff's

counsel.  The court will also deny defendants' Sealed Motion, (doc. 42), which requests

leave to supplement defendants' Motion to Disqualify and defendants' Opposition to

plaintiff's Motion for Sanctions.  As already stated above, the court previously denied

defendants' Motion to Disqualify.  (*See* doc. 44.)  Because the court finds that plaintiffs'

Motion for Sanctions is due to be denied, it does not refer to defendants' Sealed Motion

for supplemental support in opposition.

### III.  CONCLUSION

In accord with the court's discussion herein and Order entered contemporaneously with this Opinion, plaintiff's Motion to Withdraw Plaintiff's Original Sur-Reply to Defendants' Motion to Disqualify and File Substituted Sur-Reply to Defendants' Motion to Disqualify, (doc. 25), will be granted,[5] and plaintiff's Motion for Sanctions Pursuant to Rule 11, (doc. 13), will be denied.  Defendants' Motion to Disqualify was previously denied by Order of the court, (doc. 44).   Defendants' Sealed Motion, (doc. 42), is also due to be denied.

**DONE**, this the 27th day of September, 2012.


*Sharon Lovelace Blackburn*
_____
**SHARON  LOVELACE  BLACKBURN**
**CHIEF UNITED STATES DISTRICT JUDGE**

---

[5] Although prior to the entry of this Opinion the court summarily denied defendants' Motion to Disqualify, the court will grant plaintiff's Motion to Withdraw in recognition of plaintiff's counsel's good faith effort to remove from the record statements, which the court deemed inappropriate at the May 10, 2011 hearing.